THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* BURRILL RUSKAY, Appellant.

First Department, April 3, 1925.

Crimes — trading by brokers against customer's orders in violation of Penal Law, § 954 — elements of crime stated — defendant's firm purchased 200 shares on margin on customer's order and shortly thereafter sold for firm account, to firm from which it purchased, 200 shares of same stock — prima facie case made out showing trading against customer's order — evidence establishes that defendant, one of active members of firm, assented and consented to trading.

To constitute a violation of section 954 of the Penal Law, which prohibits the trading by brokers against customers' orders, it is necessary for the prosecution to prove that the defendant was a broker or a member of a firm of brokers, that he or his firm was employed by a customer to buy and carry stock upon margin; that, while acting as broker in respect to such stock, he or his firm sold for his or their account the same kind or issue of stock; or, if the stock was sold by the firm, that he consented or assented to the sale; and that the sale was with intent to trade against the customer's order.

On a prosecution for a violation of section 954 of the Penal Law, charging the defendant with trading against a customer's order, a *prima facie* case is made out by the prosecution when it is shown that the defendant's firm purchased 200 shares of certain stock on margin on a customer's order and shortly thereafter sold for its own account to the firm from which it purchased the stock 200 shares of the same stock, and the evidence establishes that the defendant, who was an active member of the firm of brokers through which the stock transaction took place, assented and consented to the particular trade in question against the customer's order.

APPEAL by the defendant, Burrill Ruskay, from a judgment of the Court of General Sessions of the Peace in and for the county

of New York, rendered on the 7th day of March, 1924, convicting him of a violation of section 954 of the Penal Law.

The defendant was indicted jointly with Eugene Greenhut and others.

*Percival E. Jackson,* for the appellant.

*Joab H. Banton, District Attorney* [*Felix C. Benvenga, Assistant District Attorney,* of counsel; *Frank E. Carstarphen, Assistant District Attorney,* and *William B. Moore, Deputy Assistant District Attorney,* with him on the brief], for the respondent.

McAvoy, J.:

The indictment upon which defendant was tried and convicted was found under section 954 of the Penal Law (as added by Laws of 1913, chap. 592). That section is entitled, " Trading by brokers against customers' orders." The statute reads:

§ 954. " A broker, who, being employed by a customer to buy and carry upon margin the stocks, bonds or other evidences of debt of a corporation, company or association, while acting as broker for such customer in respect of such stocks, bonds or other evidences of debt, sells for his own account the same kind or issue of stocks, bonds or other evidences of debt of such corporation, company or association, with intent to trade against the customer's order, or, who, being employed by a customer to sell the stocks, bonds or other evidences of debt of a corporation, company or association, while acting as broker for such customer in respect to the sale of such stocks, bonds or other evidences of debt, purchases for his own account the same kind or issue of stocks, bonds or other evidences of debt of such corporation, company or association, with intent to trade against the customer's order, is guilty of a felony, punishable by a fine of not more than five thousand dollars, or by imprisonment for not more than one year, or by both. Every member of a firm of brokers, who either does, or consents or assents to the doing of any act which by the provisions of this section is made a felony, shall be guilty of a violation thereof."

On the trial no evidence was offered by the defendant, and the matter to be determined here resolves itself into this question, were the various elements constituting the crime proven by the People? The section of the statute quoted above, apparently was designed to prevent a broker from carrying out a customer's order in appearance, but in reality offsetting the effect of his order by making the opposite transaction with the same or another broker, so that in the Stock Exchange Clearing Corporation's transactions there would be an offset to the trading which, if the prices were identical, would leave the buying or selling broker of a customer

free of any obligation to the other buying or selling broker with whom he conducted the original transaction. There had been for many years a prohibition in the Penal Law (§ 390) against what was called " bucketing," to wit, the taking of an order from a customer and not executing it in any manner. The method of conducting the affairs of the Stock Exchange Clearing Corporation made it possible to purchase or sell according to a customer's order and then trade against this purchase or sale with a correspondingly opposite transaction, without violating the statute against bucketing. This method of improper trading brought about the enactment of section 954 of the Penal Law. It is, of course, obvious that in any setoff of contracts of sale against contracts of purchase and in a settling of the differences in prices by paying cash balances, nothing is accomplished of benefit to the customer. Since no stock is purchased, if the order be to buy, no stock is ever delivered. If an order be given to sell to make the transaction legitimate, where a purchase and sale are coincident the broker must have in his possession or under his control after the offset an equal quantity of the kind of securities dealt in for the benefit of the purchasing customer subsequent to the transaction's conclusion. But when the purchase is made to avoid delivery in the case of a sale or a sale made to avoid payment in case of a buying transaction, there is a purely fictitious transaction, and trading therein runs against the customer's order and a violation of the statute is completed. A broker may not, therefore, buy securities for a customer and sell similar securities for his own account in order to avoid receiving and paying for the securities bought, nor may he sell securities for a customer and buy similar securities for his own account in order to avoid delivering the securities which apparently he has sold for a customer.

The charge here is, according to the words of the indictment, that on or about February 18, 1922, the defendants were copartners in the firm of Ruskay & Co., and engaged in the business of purchasing and selling, as brokers, stocks, bonds and other evidences of debt of corporations, companies and associations; that on or about the said date the defendants were employed as brokers by Huldreich Brunner, a customer, to buy and carry upon margin 200 shares of the common capital stock of a certain corporation called Mexican Petroleum Company, at $123.75 a share for the account of said Huldreich Brunner; that afterwards, on or about February 20, 1922, the defendants, with intent to trade against the said customer's order, and while acting as the brokers for the said Huldreich Brunner, as such customer, in respect to the said shares of stock of the said company, feloniously did sell and consent

and assent to the sale of, for their, the defendants', own account, 200 shares of stock of the said company at $120.75 a share, being stock of the same kind and issue which they, the defendants, had, on or about February 18, 1922, been employed by the said Huldreich Brunner to buy and carry upon margin, against the form of the statute, etc.

There is proof covering the purchase of the stock upon margin, that is, on February 18, 1922, one Burrill Ruskay, who was a member of the firm of S. S. Ruskay & Co., through the office of which he was a partner and in its regular course of business, received an order through its Chicago office from its customer Brunner to purchase 200 shares of Mexican Petroleum stock. This was executed in the regular course of business of the office, of which Ruskay must be deemed to have had notice by reason of his connection with the executive management of the firm.

The order was first transmitted according to the method of the firm's business to the order department on a written order slip, and the order clerk telephoned the order to the telephone clerk on the floor of the Exchange, who transmitted it to a firm floor broker. This floor broker executed the order at the Exchange and notified the telephone clerk who telephoned the execution of the order back to the order department in the firm office. The order clerk thereupon made a mark on the original order slip and sent it to the bookkeeping department, where it was entered in one of the customers' ledgers. This order of Brunner's sent from Chicago was confirmed by a slip in his mail received by him when he returned to New York. It was dated " New York, February 17, 1922," and showed a purchase for Brunner's account of 200 shares of Mexican Petroleum at $123\frac{3}{4}$. Testimony was also received from a broker named Maloney, from whom Ruskay & Co. bought the shares, that he had sold the same to Ruskay & Co.

Brunner was never called on for additional margin in respect to this purchase, but he had on deposit a sum of money realized through the sale of stock or credit against stock owned by him which amounted to nearly ten per cent of the purchase price of these shares. He never authorized the sale or disposal of the stock which was bought, nor did he receive from Ruskay & Co. any money or proceeds from the sale of any shares of Mexican Petroleum. The sale of 200 shares of Mexican Petroleum, which it is claimed was an offset sale to avoid paying for the delivery of the stock bought for Brunner, is made out by showing that Ruskay & Co. sold 200 shares of Mexican Petroleum for its own account by a transaction through an account called the " C. E. King," account, which the evidence indicates was a " house account," or in other

words, a fictitious account run for the benefit of the house for the very purpose of offsetting sales by purchase, and purchase by sales, so as to obtain clearances and avoid either payment for or delivery of stock shares, as the case might be.

The bookkeeper's account with respect to Mexican Petroleum about the date of February 18, 1922, showed that Brunner placed his order for 200 shares of Mexican Petroleum, and also showed that the King account on February 17, 1922, the date of the purchase, was short 100 shares of Mexican Petroleum. On February 18, 1922, 100 shares of Mexican Petroleum were purchased for the King account. This levelled the King account as to Mexican Petroleum shares. On February 20, 1922, 400 shares of Mexican Petroleum were sold. There was no Mexican Petroleum in the account of King, the house account, at the time of this sale. It was, therefore, a short sale for which no stock could have been delivered and was obviously designed to offset the purchase for Brunner.

Maloney testified that on February 20, 1922, he purchased 200 shares of Mexican Petroleum. This proof with respect to the purchase and sale of shares of identical stock, having in view the dates, the amounts, the necessity of offsetting the purchase by a sale, or else putting up the money to buy in the shares, constituted *prima facie* proof of the necessary elements of the crime so far as the order for purchase of stock existed, and the sale of the same kind of stock in similar amounts was made for the account of the brokerage house without receiving or having on hand stock deliverable to the purchasing customer.

The other element necessary to constitute the crime, to wit, defendant's connection with the illegal sale and his knowledge, assent and consent thereto, was made out in this manner:

One Adler was in the employ of the defendant firm from October, 1920, to February 23, 1922, when the firm failed. He had been an auditor and thereafter was private secretary to the defendant. When he became private secretary he was given a desk in the private office kept by defendant and his father, who was also a member of the firm. In October, 1921, defendant attended a conference held in defendant's office, at which conference he told Adler and one Feinman, who was an employee, also described as a general all around man, to open up accounts in the names of King, Parker, Letterman and McCullom. Burrill Ruskay, this defendant, directed Adler and Feinman to open these accounts. Ordinarily, buying or selling accounts were opened through customers with the name of a customer furnished and the figures of his purchase or sale indicated, that is, the amount of shares and the price would be entered. In this instance nothing was

given, except the four names. These instructions were communicated to Walker, the head bookkeeper, who opened the accounts under these names. When the accounts were opened, defendant told Adler that when any orders to buy or sell stock from any members of the firm were received, entries of such orders were to be made in these accounts. Thereafter Adler received orders from the defendant himself. These were known as " house accounts " or " brokerage accounts," and they were distinguished from customers' accounts because they showed the position of the firm with respect to stocks which had been loaned to other brokers and with respect to stock as to which the house was " long " or " short," that is, stocks which they had either failed to receive (long) or failed to deliver (short) as a result of their transactions with other brokerage houses. The stocks which were the subjects of transactions with other brokers might be either the firm's own stock or stock ordered to be bought or to be sold by their customers. When the customers' stock was referred to in these house accounts the name of the customer would not necessarily appear in the house accounts. The accounts simply recorded transactions to which the firm was a party.

The method of receiving accounts to be put through these house accounts was that every Monday morning a " position " sheet would be made out showing the status of stocks carried in account with other brokers, or with banks. This sheet would be handed in to the executives of the firm, which was composed of the defendant and S. S. Ruskay, his father. The sheet was always handed to S. S. Ruskay, but the defendant was present most of the time when the sheet was brought in. The position sheet would be laid on S. S. Ruskay's desk where either could look at it and the two Ruskays used the same desk. The position sheet would then be checked and marked, indicating that Adler was to buy or sell the stocks opposite which the check marks appeared. He testified that when he put in the buying or selling order he got the data from either Burrill Ruskay, this defendant, or S. S. Ruskay, and they gave him the orders after they looked at the sheet and made the check marks. Adler never got a verbal order and never saw a written order of any of these individuals whose names were used in the house accounts. When he got this checked list giving orders for stocks to be sold he gave it to the head of the order department or an assistant order clerk.

Walker, the bookkeeper, would go in after three o'clock every day after these stocks were to be sold and fill in these four names to any stocks that were bought or sold on the order sheet that did not have any customers' names next to them.

Adler testified that the defendant referred to these accounts under the names of King, McCullom, Parker and Letterman as house accounts.

Maurice Feinman gave testimony of similar import, and said that defendant was present at the time the names were mentioned as the names to be used in the house accounts. He also heard the instructions given to Adler to open up the accounts under these names. Feinman himself got orders to buy or sell from the defendant. He delivered the orders to the order clerk and saw Clarence Walker fill in the names on them of King, Parker, Letterman and McCullom.

Walker, the bookkeeper, said that his instructions from Adler and Feinman were to go to the order room each day after three o'clock and insert the names of King, Parker, Letterman and McCullom on all open transactions on the order sheets. These order sheets he got from one Minzer, the head of the order department, who was the one to whom Adler delivered the check sheets. When he got these sheets from Minzer the spaces for the names were blank, and he would fill in the names of the house accounts on them.

The stocks dealt in were allotted by system to each of these four names. Certain stocks were assigned to each account. Walker got his instructions from Adler and Feinman, whose instructions were gotten from the defendant. Daily from October, 1921, to February, 1922, Walker inserted these four names on the order sheets. Business was bad with Ruskay & Co. for weeks prior to the failure on February 23, 1922. Bankers were calling their loans and there was a run on the house and ways and means were being devised for meeting the obligations of the defendant's firm. Defendant was then in active charge of the business although absent prior to January 1, 1922, in Europe. From that date until February 23, 1922, he was in the office as before.

I think all of the elements of the crime were thus established so as to constitute the violation of law charged in the indictment and prescribed in the statute.

To constitute this violation of law it was necessary for the People to prove: (1) That the defendant was a broker or a member of a firm of brokers; (2) that he or his firm was employed by a customer to buy and carry stocks upon margin; (3) that, while acting as broker in respect to such stocks, he or his firm sold for his or their own account the same kind or issue of stocks; or, if the stocks were sold by the firm, that he consented or assented to the sale; and (4) that the sale was with intent to trade against the customer's order.

The evidence shows that all of these elements were fully established; that the defendant was a member of the firm of Ruskay & Co., and Brunner a customer of the firm; that on Friday, February 17, 1922, Brunner gave an order to the firm to purchase for him and carry on margin 200 shares of Mexican Petroleum; that, on the same day, the firm executed the order by purchasing the securities in question on the floor of the Exchange from Pearsall & Maloney; that, on the following Monday, February 20, 1922, while the relationship of broker and customer still existed, Ruskay & Co., with intent to trade against Brunner's order, sold 200 shares of Mexican Petroleum to some Exchange member, presumptively, Pearsall & Maloney, through one of its " house accounts," for its own account; that the securities sold were of the same kind and issue as those which had been bought for and in behalf of Brunner; that the securities were sold to the same brokers from whom they had been purchased; that the defendant consented and assented to the sale.

Neither the purchase nor the subsequent sale was a *bona fide* purchase or sale. Ruskay & Co. never received and paid for the securities ordered by it for Brunner's account. They never fulfilled their part of the contract with Brunner. Hence, the securities which they ordered for Brunner were never in their possession or under their control. So that, if Brunner had tendered the balance of the purchase price over and above his margin, they would never have been in a position to deliver the securities to him. Nor did there remain, after the sale and as the result of the setoff, in the possession or under the control of Ruskay & Co., sufficient securities of like kind and amount to meet the demands of the purchasing customer, even assuming C. E. King was a *bona fide* customer.

On the other hand, the securities were sold through the " house account " of C. E. King, in order to avoid receiving and paying for the securities ordered for and in behalf of Brunner. In short, Ruskay & Co. merely went through the motions of executing Brunner's order, and then later, in effect, canceled it.

The sale was made through the King account. This was one of four " house accounts." These accounts were opened the latter part of October, 1921, upon the express instructions of the defendant, for the purpose of using them in connection with transactions of the very kind and nature as that involved in this case, at a time when Ruskay & Co.'s loans were being called and the firm was in financial difficulties. The defendant was aware of this situation, because he instructed Adler and Feinman to open these four accounts with a purpose the inference of which was not doubtful.

The check marks on the " position " sheet which Adler prepared

First Department, April, 1925. [Vol. 212

and submitted to the defendant and S. S. Ruskay were the instructions of either the defendant or some other member of the firm to sell through these accounts. This position sheet was submitted to the defendant and S. S. Ruskay every Monday morning. The sale in question took place on a Monday. The position sheet submitted on the morning of the sale undoubtedly showed that Ruskay & Co. were " long " 200 shares of Mexican Petroleum, and that this represented a purchase by the firm from Pearsall & Maloney for Brunner's account.

It is a reasonable presumption which the jury rightfully indulged, that the defendant, as an active member of the firm, knew what stocks the firm was trading in for its own account, and knew when he saw on the position sheet that the firm was " long " 200 shares of Mexican Petroleum, whether or not this long position was the result of a transaction for a customer or for the house itself.

The firm was then in financial difficulties. It was about to fail, and the Ruskays, knowing this " position " and knowing that it would be either inexpedient or even impossible to pay for these securities out of their own funds, or that it would be difficult to borrow on them, because similar loans had been and were being called, then sold the same number of shares of the same kind and issue of stock back to Pearsall & Maloney, from whom they had bought them.

The sale of the 200 shares of Mexican Petroleum through the King account, when there was no Mexican Petroleum in the account, is some evidence of the fact that that particular sale was not a *bona fide* transaction. Taken with the fact that just three days prior thereto Ruskay & Co. had accepted from Brunner an order to buy and carry upon margin 200 shares of the very same stock, it created a *prima facie* case of a trade against Brunner's order. The defense might have shown that the transaction of sale was a *bona fide* one, and not a trade against Brunner's order, but no evidence appeared against the proof of the People which on its face showed a fictitious sale. This could have been shown only by proving that Ruskay & Co. acquired title to, or possession of, the 200 shares of Mexican Petroleum from Pearsall & Maloney.

The evidence, therefore, makes justifiable a finding that the defendant knew of the existence of the house accounts and the purpose for which they were opened. It also demonstrates that he was familiar with the object and purpose of the position sheet, which was the means through which orders were transmitted from defendant's private office to the order room relating to the house accounts. The defendant was fully aware of, thoroughly

familiar with, and actively engaged in this scheme of business and this phase of the firm's affairs. From such circumstances the inference is not only justifiable, but irresistible that the sale was with intent to trade against Brunner's account, and that the defendant consented and assented to the sale.

We think the judgment should be affirmed.

DOWLING, MERRELL, FINCH and MARTIN, JJ., concur.

Judgment affirmed.